The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable Court. Thank you. Be seated.  Good morning. The first case this morning is number 09-1058 Medtronic Navigation v. Brainlab. May it please the Court. This is an exceptional case, not because of anything that Medtronic or its lawyers did during the trial or beforehand, but because of how exceptionally important it is that this Court reverse the sanction award, which is not only entirely unwarranted on the facts and the law, but more fundamentally is inconsistent with an adversary system of justice in which each side is expected to present its case zealously, consistent with the contemporaneous rulings of the trial court. Mr. Waxman, here we have a district court. There's a lot of over litigation in this country and the trial courts are in a position to deal with it and we have an abusive discretion standard. Here we had a claim construction of reference means and Medtronic was seeking a claim construction that would have encompassed the accused optical device and the claim construction was that it did not include optical devices, it was just acoustic. And yet the trial court felt and gave a fair amount of explanation in its opinion that Medtronic just went right past that and misled the jury. The language of the judge's opinions includes distorting and blatantly deceiving the jury, misdirected, these words are throughout the opinion. Yes, Your Honor. Why shouldn't we just affirm that? Several reasons. The first of which is that the judge's conclusion that arguing an equivalence case, which Medtronic fully disclosed at the summary judgment stage and in its opening statement throughout all the witness testimony in its closing arguments, his conclusion that presenting an equivalence case in which we argued not that the claims literally covered optical devices, but that their function... They were arguing for a generic interpretation and they pulled back. It was like, well, the claim construction pulled back. It was like foul rapprochement. And then they went to argue again. Well, we want the same thing that the court just ruled we couldn't have. Judge Lurie, we use the example in our footnote in our reply brief of a case in which the patent claim, the claim language calls for a fastener, but the specification refers to a zipper. There is an argument at the Markman hearing. The judge concludes that because of the specification, the literal claim requires a zipper. It is garden variety, doctrine of equivalence law, to be able to come in in a forthright, open manner and say, we intend to put on proof that a button or other form of fastening device meets the function way result test. After the claim construction in this case, Medtronic withdrew three of the patents as to which it was prosecuting. It announced to the court that as to Buchholz and Roberts, not Heilbrunn, which preceded, which didn't involve this, but was preceded only by equivalence, there was full summary judgment briefing on this point with expert reports by experts who testified at trial precisely the same way that they testified on summary judgment. Judge Maitch denied summary judgment. Well, there were some differences, I take it. Your position is that there was a simplification as opposed to a change of position, but the positions of the experts, I gather, were not entirely congruent. Well, Judge Bryson, with respect, we have to distinguish between the two equivalence patents, Buchholz and Roberts, and the two literal patents, which are the Heilbrunn patents. It's the Heilbrunn patent. As to the Heilbrunn patents, even in his evulsive about-face post-trial ruling, Judge Maitch has never contended that our case was vexatious or we engaged in litigation misconduct with respect to Heilbrunn. The argument all goes to this notion that somehow proceeding on a theory of equivalence with respect to Buchholz and Roberts was vexatious or misconduct. As to Heilbrunn, what happened was there was a difference, and here's what it was. There was one element of the Heilbrunn claim that had to do with the workspace calibration element. Our expert reports, and there are two different brain lab devices. One is the vector vision, and one is exact track. Our expert report by Dr. Taylor, Professor Taylor, gave two reasons why that limitation was met in each of the two devices. One referenced workspace calibration, and the other referenced camera calibration. At trial, he proceeded with testimony and evidence relating to workspace calibration as to either. That is, we simplified our proof and relied on one argument and one demonstration for why that claim was literally met as to each of their devices. That was my understanding. You characterized it as simplification. Your opposing counsel, I think, characterized it, if I recall correctly, as a change of position. As to each of their two devices, we argued as to Heilbrunn, this element. Our expert presented testimony as to two reasons why it was met. At trial, we presented only one. But I think Judge Lurie, as to Buholz and Roberts, that is, the equivalence or non-equivalence of optical or passive optical to active acoustic and electromagnetic, this was fully and completely disclosed. We won on summary judgment. We won on not one but two Rule 50A motions filed by Brain Lab on this point exactly. We got a jury verdict on this point. And the notion that, and I think I'm finally winding my way around to your question, the notion that our manner of litigation was vexatious and that it distorted the court's claim construction is an error of law. This was, as any review of the record in this case will show, this was a garden-variety doctrinal equivalence case as to which there was, you know, we lost in a Rule 50 motion and you affirmed. I recognize that. But we had a very credible case that was elusively disclosed about why we met the function. There wasn't even a contest as to either function or result. They agreed, the trial court agreed, that the function and the result of the optical sensors versus the acoustic and electromagnetic sensors was the same. A whole dispute was about the way. And we had an expert witness fully opine on this in his report. Okay, but we appreciate we aren't reviewing the merits. Let me ask you what I find particularly troublesome. I can understand. We'll save Mr. Phillips time. I don't want to be not neighborly. I promised I would sit down after five minutes and I see it's seven minutes. Well, I'm going to ask him the same question I'm about to ask you. And that is, I can appreciate in a lengthy trial that one can always find this or that to complain about. And when you pull the infractions or misstatements or whatever else together in one place, they look pretty bad. Now, this is an experienced judge who seems to have recognized that as he proceeded with the trial. But obviously, when it was all over, something very much bothered this judge. And this really relates to what Judge Luria was asking as well. The judge was there. We weren't. And an experienced judge, after seeing all of these distinguished counsel in action, concludes that they went too far. Now, how can we penetrate that? That's what's so very troubling about the consequence, even the prospect of an affirmance in this case, Judge Newman, because in this case we have a very, very pellucid pretrial and trial record. We know how, as to each of the current assignments of litigation misconduct, we know exactly what happened and exactly what the judge did. And the judge's litigation misconduct conclusion is predicated on four principles. And I can go quickly through the four of them or defer to Mr. Phillips. We'll see them. They're discussed by your opponents.  The first one was, and really what permeates his entire sanctions opinion and his Rule 50B opinion was that we had distorted his claim construction. That's just wrong. Witness every single time, in our opening statement, in our closing argument, in Grimson's testimony, Smith's testimony, Buchholz's testimony. You look at the cited pages. They are absolutely scrupulous about making clear that they understand that the claim was literally construed to require an array of microphones, that they are proceeding under an equivalence, and that it is explained over and over and over again in this case. So he has simply made, and he understood that. He overruled a dozen or more objections on this point with the contemporaneous explanation that this is the function way result test analysis, and he's explaining why he thinks it's an equivalent. He ruled for us three times on this basis. It is an error of law for him to have subsequently changed his mind and concluded that by proceeding on an equivalence theory, we were distorting his rulings. That's number one. It's an error of law to have changed his mind on a question of fact? No, it is an error of law to have construed a garden variety doctrine of equivalence case plainly presented with nothing concealed at all. Which is a fact question. It is an error of law to, this is my submission to you, it is an error of law to construe a garden variety doctrine of equivalence defense plainly presented as a distortion of the literal claim construction. That's the error of law. Now, he made three subsidiary findings with respect to litigation misconduct, and I think I can address each of them fairly quickly. The first was he said, well, our demonstration of our device, the stealth station, was an improper effort to invite the jury to make a product-to-product comparison. Now, a couple of things about this. I thought it wasn't demonstrated. It was demonstrated. He ruled three times over Brain Lab's objection that this could be demonstrated under right height for the purpose of showing lost profits. They even, in his last ruling, they said, well, we'll stipulate that these products compete with each other. And we've reprinted in our reply brief, I think, his ruling, where he said to Brain Lab's lawyer, are you going to demonstrate your machine? They said yes. He said, well, then I'm going to let them demonstrate their machine with an instruction that the jury, for purposes of determining infringement, is not to make a product-to-product comparison. And he gave that instruction then. He gave that instruction in closing. And interestingly, he gave that instruction, and he interrupted Mr. Campbell's opening statement, which was making incessant product-to-product comparisons, twice sustained objections by Medtronic's trial lawyer during their opening statement that they were making product-to-product comparisons. And he interrupted Mr. Campbell and instructed the jury during opening that they were not to do so. So he, after the fact, five months after the trial is over, he is castigating Medtronic for showing its device when he had three times ruled that it could be shown. There was not a single reference in the demonstration to their product. There was no objection made during the demonstration, and he specifically allowed it under right height. Yes, it is an error of law to conclude under that basis that we've engaged in sanctionable conduct. Mr. Weitzman, you may be getting to this one, but let's assume now that we agree with you that there was no impropriety in pursuing the doctrinal equivalence theory, but focusing entirely on the incidence of litigation misconduct. The one that frankly gave me the most pause is the FDA submission being converted into, quote, substantial equivalence, substantial equivalence, substantial equivalence, doctrine of equivalence, which I think we can all agree is not correct. As a legal matter, it is not the same thing to say substantial equivalence between these two products and doctrine of equivalence. I have actually quite a bit to say about this, and it is on my checklist of things. Let me go right to it, because I agree that this is, I mean, in terms of something that might raise eyebrows, this is really the only thing, I think, in this case, the only other point that he mentions, which maybe the court does indeed elucidation about, is the closing argument remarks about prosecution history. Well, actually, the one that is most troubling was the one in the opening statement. Okay, well, let me make a couple of points about this, first of all. We never contended that the FDA application and their claim of substantial equivalence under 510K amounted to the same test or established infringement by the doctrine of equivalence, although it wasn't until three years after the trial in this court that this court ruled that as a, I mean, it clearly involves a 403-401, you know, prejudice versus probative value issue,  that it was not admissible as a categorical matter to prove doctrinal equivalence. But be that as it may, we never argued it. We made clear that that wasn't the test. It was, we, let me start, let me go through this chronologically. Long before trial, in the summary judgment briefing and in the pretrial conference, it was clear that Brain Lab's theory was they were going to win because they were the innovator, their product was first, and we copied. We put their FDA submission on our exhibit list. It was referenced by Mr. McMahon during his opening statement, and I am not here saying that the reference to doctrinal equivalence in that ungrammatical sentence, our position is, his contention is, that it was a, that was a misstatement. It was a misstatement that was not objected to. They didn't request, at the time, they did not request that the jury be instructed. They did not discuss it in their motion for sanctions before Judge Meech. Judge Meech doesn't discuss it in his ruling. I interpreted Judge Meech's reference to the FDA application. Now, I understand there are two elements to that. One is an admission of equivalence for purposes of damages versus an admission for purposes of infringement, but Judge Meech refers to the argument made by counsel as deceiving the jury into accepting the statements in the FDA application as admission of patent infringement, which I took it to mean that that refers to the effort to draw a parallel between substantial equivalence in the FDA application and equivalence under the doctrine of equivalence. So that was Judge Meech's characterization. Absolutely right. That refers to this? No, that refers to the rebuttal closing argument. Judge Meech never makes any reference, even a citation, to the opening statement. And I'm going to get to the rebuttal closing argument, but first let me just say this. The FDA statement was introduced into evidence without objection during our cross-examination of Dr. Bilsmeier for the avowed purpose of demonstrating that we were the innovator and they were claiming a right to sell their device because it was substantial equivalent to ours. At closing argument, which is where this incident admission point comes up, in our opening closing, in our initial closing, we didn't mention the FDA at all. Not one word about the FDA. Mr. Schunk, who was making the closing argument for Brain Lab, mentioned it twice. He opened his closing argument with a reference to the FDA application and he closed with it. And so on rebuttal, Mr. McMahon got up and said, among many other things, they're talking about the FDA, the FDA application, and let's talk about this. And if you look at the reference pages, which are... It's very, very important, I think. This is page 7657 and 7658 of the JA. He says, so counsel has made a big deal about the FDA and that somehow they innovated. Okay, let's see what happens. And Mr. Schunk objects. Your Honor, this is comparing the devices, not the device to the claims. Mr. McMahon, no, Your Honor. This is the discussion here. This is an admission that was made before the FDA, the court. Go ahead. It was clear that what was being argued was they admitted in their application before the FDA that contrary to their contention that they were the innovator, they were seeking the request for a license because we were. How does that relate to infringement? I mean, how does who the innovator is relate to infringement at all? What Judge Maitch is saying is, as I understand it, is that this reference to substantial equivalence, which was what the argument was directed to with respect to the FDA submission and repeated on several occasions, substantial equivalence. This is not just in the opening statement, although it's more extreme in the opening statement. But in the closing statement as well, it's substantial equivalence. What I understood Judge Maitch's reference to that to mean is that's an effort to make substantial equivalence into an infringement-related issue. Why not? Well, I mean, honestly, I think several points. One, if the sanctions award, the first point is there were two objections made during this rebuttal closing. The judge ruled for us and allowed this both times. He either understood or didn't understand at the time that we were making the argument that we were the innovator in contrast to their argument that they were. Now, trials, Judge Bryson, you know from reviewing the records in many of them, trials are not perfect. Mistakes are made. This case was tried for three weeks. There was plenty of misstatement on both sides, including their closing argument, in which after the judge made clear that prosecution history estoppel was for the court, not for the jury, they spent pages arguing to the jury that it should limit the claims of buhols because there had been a clear waiver or clear disavowal of this and the jury should view the claims as not permissibly including optical. We objected. We didn't actually object. We stood up and said, Mr. McMahon said, look, that is crazy. The judge is not going to instruct you that that's for him. I mean, the fact that they said that, the fact that in their opening statement they had to be admonished twice for making product-to-product comparisons doesn't mean that a Section 285 award of millions of dollars of sanctions is appropriate under a standard, as this court said in Forrest Labs, that it is necessary in order to prevent a gross injustice. Trials are rough and messy things, and the notion that Medtronic and Brain Lab would be sanctioned and subject to public admonition as having engaged  that were either not objected to at the time at opening statement or were objected to and were permitted at closing argument is a... I mean, to say that there is a chill in the trial bar even because of what Judge Maitch has done after the fact, but what this court might sanction is quite an understatement. Trials are messy things, and you're saying that this court should overrule a trial judge that's trying to draw a line and say, this much is too much. Judge Lurie, if Judge Maitch drew the line very clearly prior to trial and throughout the trial, one of the remarkable things about this, the most remarkable thing about this case is, unlike the other cases in which you found litigation misconduct of any sort, there is no fooling, there is no concealing, there is no dissembling. Everything is absolutely out there, and he ruled every single instance that he points to for litigation misconduct was either the subject of no objection at the time or he overruled the objection and agreed and allowed us to go on. And it's that that's so concerning. Absolutely. I mean, the role of the trial judge is to be a fair judge and a traffic cop that makes rulings both beforehand as to whether you can proceed on equivalence theory or show the stealth station or at the time of trial, and Judge Maitch did that. And what is just so exceptional about this case is that five months after the trial is over, he came to a conclusion that essentially reversed every judgment and trial ruling that he made during the time of this trial, and that's what's so scary about the prospect of an appellate affirmance. Okay, let's move on. Thank you. I very much appreciate that. Mr. Phillips? It's always hard to come in second, Mr. Phillips, particularly when number one has done as admirable and comprehensive a job as he has in this particular instance. I'm not anxious to belabor any of the points that Mr. Waxman has already made, but I do think it's important to recognize the reason I'm here, and it goes directly to your question, Judge Lurie, which is why should we try to unpack precisely what the district judge has done in this context? And it is because the judge has gone the extraordinary step further and imposed sanctions directly against the law firm involved in this particular case, and therefore the reputational injury that is brought as a consequence of the order here is an extraordinary one. You're saying that applies to the law firm but not the company? Well, I think it heightens the concerns that this court ought to take into account in evaluating whether or not something is an abuse of discretion. I'm sorry? Gets into a malpractice argument? Well, it's beyond a malpractice argument. In other words, a failure to raise an equivalence issue raises a malpractice question. Well, it would place you in an extraordinary position if you step back and say to the lawyer, you've made a good-faith argument with respect to summary judgment. The district court has denied the other side's motion, and now what is the lawyer supposed to do? Go back to the client and say, I'm sorry, but I've reevaluated it and decided we can't make a good-faith argument? I'd also think that's a reasonable basis on which to ultimately, after the fact, file sanctions. Doesn't that and shouldn't that happen at times where the lawyer says to the client, for this, that, and the other reason, you no longer have a case? I'm sure there are situations where that happens. The place where it seems to me least likely ever to be true would be in the context of the doctrine of equivalence, which is about as squishy a set of requirements as exists out there. And particularly, as Mr. Waxman pointed out, if you look at the function and the result, there's no question that there was no issue about their equivalence. It's only with respect to the way element of it. Which is usually the issue. To be sure, but the point is that you already have two-thirds of the doctrine of equivalence ultimately uncontested, and the only question is whether or not you can make a good-faith argument. And, again, you lay it all out. There is no dissembling. There is no concealment here. It was all put forward in the summary judgment papers to the district court. I take it that your position is that if we disagree with Judge Mage as to the question of whether this should have gone beyond summary judgment, this case is over with respect to your client, because the 1927 does not reach the misconduct. I think that's clear. I suppose you could make an argument that somehow the inherent powers doctrine is out there, but it seems to me 1927 does the work here, and therefore there is no role for the inherent powers argument to be applied. Clearly, there would be no basis for a $4 million award without the multiplicity argument. There's no colorable argument with respect to that. The only way you can get to that kind of an award, even against Medtronic, obviously, is through the exceptional circumstances. Right. I don't think there's any question about that. That said, I have to be honest with you, Judge Bryson. The findings of misconduct continue to serve as a significant black mark on my client's reputation, and I think it's worth the court taking a very hard look at each of those instances of misconduct, because, candidly, I don't think they withstand serious scrutiny. I understand the district judge is closer to it, and he has that advantage, but the truth is, we're talking about a district judge who, at the end of the trial, complimented the lawyers in this case for their professionalism and for the efficiency with which they handled this matter. So, at least in terms of how the case proceeded, there was no question in his mind about the legitimacy of what the lawyers had done here. It's only in retrospect, in post hoc hindsight evaluation, that the court then suddenly comes around and concludes, I should never have allowed this case to go forward. Well, that's fine. And he did the right thing. He granted JMOL after the jury verdict, and that's fine. But the basis for then going forward, and not only imposing sanctions on the client, but the lawyers is, frankly, totally beyond the pale, when the basis for those sanctions, at least once you get past the summary judgment ruling, which I think ultimately is indefensible, is product to product comparisons, where it was absolutely clear that that was done for lost profits, multiple instructions to the jury. It may well be that Judge Mace was right, that the jury still got confused. I understand how that could happen, and that they may have viewed it that way. Or it may be that there are a hundred other reasons why the jury ended up reaching the conclusion. I know that he thought that the counsel went too far in pointing to equivalency of product to product and confusing the jury. And this is really where perhaps, if I read every word of the transcript, it might be a little bit clearer. But what is your perception as to what, in fact, concerned this judge the most? The fact that the jury, by treading this very fine line between substantial equivalence and the doctrine of equivalence, was deliberately misled into reaching a conclusion that the facts didn't support? No, I mean, I think what ultimately drove the analysis, because I think all of the findings of misconduct really are subsidiary to what ultimately was the primary concern to Judge Mace, which was the whole notion that after his claim construction, the effort to put forward a doctrine of equivalence argument was, in some sense, re-arguing the literal infringement theory. And that's ultimately what drove him to say, I think there's a problem here and one that needs to be corrected by way of sanctions. I think he's wrong about that. I think it's clear that the doctrine of equivalence argument that was in here was offered in good faith, put before him, and if he should have granted summary judgment, that's fine, but he chose not to do so, and what you expect after that follows. So when you get down to these specific elements of alleged misconduct, I frankly think each of them really is quite trivial in the scheme of things. It may well be that the jury was misled, but there's no evidence that we perpetrated that effort to mislead. Indeed, we are the ones who said specifically, Your Honor, you should instruct the jury that this is only with respect to lost profits. That came from us. Yeah, but not to beat a dead horse, and this horse is probably close to death anyway, but this whole business, I have to say that I kind of gagged on the substantial equivalence, doctrine of equivalence line, and it comes back. It's a theme that I can easily see how a jury led to that conclusion, could say, You know what? Look at this FDA statement. They admitted that this was equivalent. Well, I can understand how the jury may have gotten that confusion, but what I can't say is in light of this record that that was somehow our intention. First of all, again, the opening statement, I mean, look, the language substantial equivalence and doctrine of equivalence spelled differently is a complicated line to try to draw, but we had a very legitimate reason to put forward the FDA's determination that they were substantially equivalent. The other side was making a pitch that they were the innovator, and we were making a pitch that we were the innovator. We were the ones who came up with it, and the best evidence of it was that the FDA had said, Theirs is substantially equivalent to ours,  Equivalent, but not equivalence to the patent claims. Right. That's... But that's not... But again, that assumes somehow the lawyers were trying to take advantage of something. I listened to that section, which was provided to it, just for exactly this reason, to see if it sounded like a slip of the tongue, and for what it's worth, I came away with the impression that it was intentional. It didn't sound like a slip of the tongue. But again, even if you accept that, Judge Bryson, first of all, it's not the item that the district judge adopted, so it's not as though that's a finding, that that was not a slip of the tongue to which you have to defer. The only one he points to is the reference to admission, which is only in the rebuttal portion at the back end of it. I think those elements are intertwined as I read the district court's opinion, but maybe... The district judge is very explicit about referring to admission, and admission only takes place... And there are two references, the two different pages. It's 7657 and 7658, and the first one is absolutely crystal, that all they're talking about is an admission that our product came first. They are admitting that our product came first. He relies on the second one, taken slightly out of context, where he says this is an admission, where he says that you could potentially read that a different way, but it's pretty clear to me that throughout, if you read this fairly, that counsel was simply making the argument that this is an admission, that they are equivalent, we were first, and therefore that's a perfectly permissible way to go. And again, put it in the context of it's responding to an argument that has been made by the other side. This is not, Judge Bryson, part of some master plan to sort of throw this theme in. There are two sporadic references to it, one at the very beginning in the opening, and one in the rebuttal in the closing. The one thing else that the lawyers do remotely reflects some effort to make... The one in the closing that seemed to me to tie back into the opening more than any of the admission references was the reference to substantial equivalence that bears directly on what we're doing here today, i.e. infringement. Well, except that what we're doing here today is evaluating every aspect of the case. In this context, again, he's talking... This is a rebuttal to an argument that was made by the other side that we are the innovators. And he's trying to debunk that notion and saying, no, this is a pioneer patent, we were the innovators, we're the ones who should be regarded as the good guys in this context. And he's trying to make that argument, again, recognizing that this is not something where the judge seemed to misunderstand what we were trying to accomplish there or that he had any problem with it. It's only six months after the fact when he comes in. And then, of course, the final point is the prosecution history estoppel, which I frankly don't think there's much to say and I don't even see the other side as having said much about that. I would like to end with the same point that my brother Waxman did, which is it is incredibly important for this court to recognize the extraordinary chill that this ruling has had and will have in terms of how lawyers are supposed to respond when they, in fact, succeed in making reasonable arguments and then expose themselves after the fact to what I regard as an extraordinary award and one that I hope this court will reverse. Okay. Thank you, Mr. Phillips. Mr. Campbell, would you enlarge Mr. Campbell's time? I suppose double it. I guess we may not need it all, but as much as we need. I don't know how much I'll need, Your Honor. Please proceed. But I'm happy to have whatever you want, whatever you want to give me. Mr. Campbell, what do you think was the focus? Why did this experienced trial judge change his mind from having complimented counsel at the end of trial to some months later vigorously chastising your opposition? Well, I think that the fact that he complimented trial at the end of the trial doesn't, or trial counsel at the end of the trial doesn't mean that much. I've been to many trials. I'm sure sat through many trials, as have Your Honors. That is a conventional thing that almost every judge does at the end of almost every trial, regardless of what happens. You think it's common courtesy? Yes, it is. It just happens. You're in front of your clients. A lot has gone on. The jury has just come back. That's generally what a judge says. But your problem is that there was a jury verdict, and there was a denial of JMOL, and a lot went on here in their favor. Yes, you're right. You just turned a corner. No, we didn't. Well, I think what happened is the judge realized that these weren't isolated incidences, which is what it seemed like at the beginning. Most of the times when there was an objection from us, the judge overruled it. But he didn't strictly overrule it. He overruled it because, for example, trial counsel would say, I'm not going to do that. I'm not going to make the comparison. And then the next thing he goes to is the page right out of the FDA submission, which says, comparing the devices, substantial equivalent. So even though... Well, I don't want to cut you off as you're outlining your general approach, but just for whatever it's worth, my own sense of this, and the reason I focus so much on this substantial equivalence, which you've turned to, is because I frankly have looked at all of the various points that the judge and you in your brief have alluded to, and I'm having a hard time finding anything else that I can point to and say, wow, now there's a problem. Aside from the substantial equivalence? Aside from the substantial equivalence. And so in talking about the elements that you think justify what the judge did in this case, try to help me see what is so horrific about each of the things that you complain about that the judge, where you think the judge was justified in saying this warrants the exceptional case treatment and 1927 sanctions against the firm. Yes, first I want to point out we're doing this four years after the trial. The judge, of course, sat through the trial. The judge sat through, understood the discovery. He understood the claim construction, everything else, 13 days of trial. He was the one best able to look at this as it happened, not on a cold record. But I think what happened and the judge realized towards the end of trial is that these weren't isolated incidents. It wasn't just substantial equivalence. It wasn't just this distortion of the claim construction. It wasn't just the comparison of the devices. They all came together, as the judge said, to form a common strategy. And that's how they got to the jury. It started with the doctrine of equivalence argument. And I know they say that it's a garden variety doctrine of equivalence argument, but it's not. If you want to get to the footnote, what their footnote says in their brief is that a claim will be to a fastener. And the judge says, well, what faster means is button or zipper. What it means is zipper. Then what you do is you combine or you compare a button to a zipper. That's the doctrine of equivalence. That's not what they did. The judge said that the array means was an array of microphones. The reference means was an array of microphones. That wasn't their comparison. They weren't comparing something to an array of microphones or comparing passive optical to active acoustic. What they did is they got rid of that reference means. They got rid of the microphones and they just said it's sensors. They said it's exactly what they've lost on. And if you see, if you go through all the exhibits they used, they got rid of the microphone array and they compared everything to sensors. So this wasn't the button versus zipper. This is button back to fastener. So it was an improper doctrine of equivalence analysis. And that's why the judge was upset because he issued his ruling. He determined what the doctrine of equivalence meant. I mean, he determined what the claim construction meant. And they disregarded that. They disregarded that from the very first witness. But isn't that what advocates do? They were presenting a theory that no, it doesn't really matter particularly what scientific procedure is used to achieve this result, that whether you use microphones or sensors, whatever. That was their argument. Your argument was otherwise. The jury went one way. The judge went the other. And we upheld the judge. But there's a... At some stage, obviously, the trial judge thought that they went too far in the argument. And where I am having the trouble is deciding where the argument loses its legitimacy. As you know, each side puts its argument forward in the strongest possible terms. Right. And again, in the heat of trial, how does one know? Certainly, counsel is not looking to blight their reputation with having gone too far and having it publicized and all the rest of it. Where did they go so far that these serious sanctions were warranted? I think what Judge Mage said is they went too far overall, if nothing else. I mean, some of these things were egregious, like the FDA submission and things like that, some of the comparisons. But where the judge said is this was a strategy. He determined that these weren't all isolated instances that happened. It was a strategy. Everyone has a strategy. Where did that strategy go too far? Ah. Well, where the strategy went too far is they took this from being a case about a patent in Brain Lab's device to being about something wholly different, whether Brain Lab's device was the same as the Medtronic device, the stealth station. And if so, the way they used the comparisons, the way they used the FDA equivalent argument, that's all the jury had to do. You said the same. They argued it was equivalent. They lost on the same ends. Excuse me? They argued it was equivalent. They argued it wasn't equivalent to the patent. It wasn't equivalent to the claim, which is what we all know you have to do in a patent case. You look at the defendant's device and you compare it to the claim. You determine whether it's equivalent to the claim. That's not what they did. And I don't think, to be honest, Judge Mache realized at the very beginning what they were doing. What did they do? Compare it to their own non-patented product? They compared it to their own product. Well, first they represented to the judge that their product, they were going to show that their product was covered by the claims. And then the judge was a little more comfortable letting the jury see that. Well, we know now that they knew that that was a misstatement at the very time because now they admit that they know that their product wasn't covered. So, you know, they made this direct misstatement to the judge so they could build this comparison. And then they brought in the FDA statement which made it so that they could just say, look, members of the jury, substantial equivalence, doctrine of equivalence, it's the same thing. You don't even have to look at the patent. You compare our devices and because under the doctrine of equivalence analysis we've used, we've shown you... No, they didn't say that. You're saying that, right? Well, no, that's the gist of it. But they did say What you're saying is what the jury understood. Exactly. And what the judge said that the jury understood. The judge who was there at the time, that's what he took away from this. That's what you're going to understand. All these references to substantial equivalence are is comparing the devices because they happen throughout the case. It wasn't just one isolated incident. You know, first he mentions it in the opening argument. Of course, you know, they're the plaintiffs. They go first. They bring that up before Brain Lab even says a word. They bring up the FDA submission. They talk about substantial equivalence several times and then Mr. McMahon says that's doctrine of equivalence or doctrine of equivalent as it came out. We're hearing from the other side the reputational,        You're in a law firm. You're in a law firm. You're in a law firm. You're in a law firm. You're in a law firm. You're in a law firm. Aren't you attempting to pollute the pawn you live in? No, I don't think so, Your Honor, because I'm not advocating that you can't make a doctrine of equivalence argument. You can. We all do. We should. But you have to make the right comparison. You compare the device to the claims as construed by the judge. That's not what they did. Mr. McMahon is a wonderful trial lawyer. One of the best I've ever seen. I've litigated against him. He's great. But they went too far. And they went too far, we believe, because they knew fully well aware at claim construction they didn't have a case. And that's exactly what the judge makes it. How do you define too far? How do you define too far? If we were to define for you and affirm, is there a bright line that we should adopt? Of course not. There is no bright line. That's why the standard set here is clear error. You know, we look to whether the judge clearly errors. Abusive discretion. What? Clear error or abusive discretion. Well, they come down to the same thing. Abusive discretion, the first thing you look at is whether there's clear error, right? So it is clear error or abusive discretion. It comes down to the same thing. Meaning, is what the judge said plausible? If the allegations of litigation misconduct such as the product to product comparison and the reference to the FDA equivalence had not occurred but instead counsel had and the witnesses had scrupulously referred to the array of microphones instead of the sensors each time, would it have been appropriate in your view for the plaintiffs to have taken the case to verdict? No, because as the judge found from the beginning they had full awareness their case was without merit. I mean, if they could have made that comparison, sure. Why exactly was their case without merit? Well, they talk about summary judgment and that the judge had this all at summary judgment. Well, what the judge had were conclusory opinions from their expert and representation from counsel that, oh, sure, your honor, there's loads of factual questions. Wait a minute. An affidavit in opposition to summary judgment typically doesn't say there's loads of evidence and we'll tell you about it later. What they did, what they did is they submitted conclusory affidavits from their experts. Conclusory affidavits which said, oh, these are equivalent. They said they relied on those to think that they had a good faith basis. Well, they, of course, had more access to their experts than we did. And just in simple cross-examination at trial, the experts admitted that there was very little basis. For example, Heilbrunn, Heilbrunn, they said that the reason that Heilbrunn was infringed was because it stopped every 20th of a second, looked at this thing called a Mayfield reference star, recalculated everything, and it always had to find it first. Well, I cross-examined Dr. Heilbrunn and I asked him, where is that in the code? You spent thousands of hours looking at the code, where is it? He admitted it's not in there. He did not know anywhere where it could be found. So the very fundamental basis, the fundamental basis of the theory was that the brain lab put on a    lost before the jury. Yes. Now, what was the case that was the case that was the case that was